UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re:

OLD MARKET GROUP HOLDINGS CORP., et al

Chapter 11 Case No.
20-10161 (PB) (Jointly Administered)

-----------------------------------------------------------x
OLD MARKET GROUP HOLDINGS CORP.

                Appellant,

22-cv-10934 (PKC)

     -against-

OPINION AND ORDER

400 WALNUT AVENUE, LLC,

                Appellee.

-----------------------------------------------------------x

CASTEL, U.S.D.J.:

        Fairway Group Holdings Corp. and its affiliates filed for chapter 11 bankruptcy and reorganized as Old Market Group Holdings Corp. ("Debtors"). As part of these chapter 11 proceedings, Debtors transferred their leasehold interest in a warehouse to Village Supermarkets by means of an assumption and assignment of the lease.[1] Under Bankruptcy Code section 365(b)(1), Debtors were required to cure any existing defaults under the lease at the time of assumption. In anticipation of the transaction, Debtors served a cure notice on the warehouse's landlord, 400 Walnut Avenue LLC ("Landlord"), that proposed to pay $86,000. The Landlord objected and asserted approximately $2.01 million in cure costs.

        The Bankruptcy Court heard argument on the Debtors' assertion that section 365 incorporated the lease definition of "default" and that under the terms of the lease there was no

---

[1] The parties and the Bankruptcy Court refer to the transaction as a "sale" because it was part of a larger transaction where Debtors exchanged control of several leases for monetary compensation from Village.

default. Thus, according to the Debtors, there was no default for Debtors to cure under the code. In a written decision, the Bankruptcy Court rejected this argument on two grounds: The Court found that (1) even if section 365 incorporated the lease language, the requirements for a default under the terms of the lease had been met. But the Court further held that (2) the term "default" in the Bankruptcy Code was used in its ordinary sense rather than incorporating the definition used in the lease. Because the Bankruptcy Court was dealing with the threshold issue of the grounds for default, the amount necessary to cure any default was left to subsequent proceedings.

Debtors move for leave to appeal this interlocutory order. Consistent with the high bar to hear such appeals, the Court will deny the motion.

I. BACKGROUND

   A. Factual Background

The Court assumes familiarity with the background of the bankruptcy proceedings in this case. The facts summarized below are taken from and more fully described in the decision from which Debtors seek to appeal. See In re Old Mkt. Grp. Holdings Corp., 647 B.R. 104 (Bankr. S.D.N.Y. 2022) (Dkt. 1, Ex. A) ("Order").[2]

Fairway operated a chain of supermarkets in the New York City area and in January 2020 filed for chapter 11 protection. (Order at 3) Most of Fairway's assets were sold off by Debtors during the bankruptcy proceedings. (Id.) In one such arrangement, Debtors agreed to sell five stores and a product distribution center warehouse ("PDC") to Village Supermarkets. (Id. at 4) The "sale" was completed by assumption and assignment of the leases on these properties to Village. (Id.)

---

[2] Citations to the Order of the Bankruptcy Court reflect the pagination of the slip opinion. See Dkt. 1, Ex. A.

The sale of these assets generated the following documents: (1) an asset purchase agreement dated March 25, 2020; (2) an order from the Bankruptcy Court approving the sale issued April 20, 2020 ("Sale Order"), and (3) an agreement of May 6, 2020 whereby Debtors assumed the leases and assigned them to Village. (Id.) The asset purchase agreement stated that Village would acquire the assets "free and clear all Liens and Claims." Id. at 5. The Sale Order also included "extensive free-and-clear provisions." Id. Village's responsibility for any cure costs associated with the sale would be limited to one month's rent, an amount it paid at the closing. (Id.) The Sale Order "specifically shielded Village from any liability to counterparties, including the [PDC] Landlord, for cure claims or pre-sale defaults of any sort." Id. at 6.

In anticipation of the transaction, Debtors filed a February 2020 notice proposing to pay the Landlord $86,000 to cure defaults associated with the PDC lease. (Id.) The Landlord filed an objection on March 4, 2020—amended five days later—which asserted that the actual cure costs were approximately $2.01 million. (Id.)

To possibly avoid discovery and a trial over this cure dispute, the Bankruptcy Court held a hearing on two threshold legal issues. At the argument, Debtors asserted (1) that the Landlord had suffered no actual or hypothetical damages—and therefore could recover no cure costs—because under the lease Village could be compelled to make any needed repairs; and (2) that there was no default requiring cure under section 365(b)(1) because no defaults existed under the terms of the PDC Lease. (Id. at 7) The Bankruptcy Court reserved decision, and on December 13, 2022, it issued a decision rejecting both arguments.

B. <u>Bankruptcy Court Order</u>

1. Village's repair obligation for pre-sale conditions

Debtors argued that they were not required to cure any defaults because under the terms of the assigned lease Village would still be responsible for any ongoing required repairs; this included any conditions that arose prior to the sale. (Id. at 9) Debtors argued that Village had agreed to take assignment of the PDC lease on an "as is" basis and was aware at the time of the transaction that the property needed repair; consequently, there was no pecuniary harm to Landlord for Debtors to cure. (Id. at 10)

The Bankruptcy Court rejected this argument on multiple grounds. The Court acknowledged that the purchase and assignment agreements included "as is" language, but given the extensive and unambiguous "free and clear" provisions in both agreements, it determined that this provision must be read narrowly to only "bar Village from asserting any claim against the Debtors for pre-sale defects, but not to impose any affirmative repair obligation on Village." Id. at 11. Additionally, the Court pointed out that the Sale Order included no "as is" provision, but it did include the "customary" and "standard 'free and clear' provisions, shielding Village from all liabilities that arose prior to the sale and related in any way to the acquired assets." Id. at 4.

At argument, Debtors argued that the claims raised by the Landlord in its cure objection were not "claims" within the meaning of the Sale Order's free-and-clear provisions because they had not ripened into defaults under the lease. They argued that the lease required 30 days' notice before any failure to perform an obligation under the lease would ripen into a default. (Id. at 12) Debtors argued that the Landlord had never given notice demanding repairs, and therefore there had been no default before the assignment. If there was no default, there was no "claim." (Id.)

-4-

The Court rejected this argument as well. It determined that the Landlord's cure objection itself served as notice of needed repairs as required under the lease. As the objection was filed over 30 days before the date of the transaction, even under Debtors' own theory the repair obligations would have ripened and been their responsibility, not Village's. (Id.)

Additionally, the Court rejected Debtor's theory of interpretation outright. The lease terms did not govern: The free-and-clear provisions of the Sale Order used the definition of "claim" from the Bankruptcy code, not the lease. This sense of "claim" was broad and covered any repair obligations regardless of demand or notice from the Landlord. (Id. at 12–13) The Court held that "to the extent repairs were needed at the time of the Village sale," the free-and-clear provisions "shield Village from any liability on account of that claim." Id. at 13. Therefore, "the Landlord's only recourse for any defective conditions that existed at the time of the sale is to recover on its cure claim against the Debtors." Id.

The Court alternately held that even if there were no free-and-clear provisions—which would potentially mean the Landlord could pursue repair costs as against Village—Debtors' would nevertheless still have had an obligation to cure all defaults that existed at the time of sale. Bankruptcy Code section 365(b)(1) requires cure, compensation, or adequate assurance of compensation or compliance as a prerequisite to assuming a lease or contract. It was thus a condition of the transaction—which took the form of assumption and assignment—that any existing defaulted repair obligations be cured by Debtors. (Id. at 13–15)

2. Default under the terms of the lease

Debtor's second argument was that the term "default" as used in section 365 referred to a default under the terms of the relevant lease, and the default provisions of the lease had not been satisfied for any of the alleged repair obligations. Therefore, there was no default

-5-

to cure. (Id. at 15) This argument relied on the same theory as Debtors' argument about "claims" under the free-and-clear provisions: The lease required 30 days' notice before a default would ripen, but the Landlord had never given notice by demanding repairs. (Id.)

The Bankruptcy Court rejected this argument on similar grounds as before. The cure objection served as "notice" under the lease and more than 30 days elapsed between that notice and the assumption and assignment of the lease. Even under the terms of the lease, Debtors had defaulted. (Id. at 16) And regardless, the Court held that the definition in the lease did not control the statutory meaning of term "default." The Court concluded that "a default exists under [section 365(b)(1)] whenever the debtor has failed to perform its obligations under its contract or lease, regardless of whether that failure amounted to a default as defined by the contract or lease." (Id.) The Court relied on persuasive authority from the Ninth Circuit and this district for the proposition that, "'default,' as used in Section 365, does not incorporate the definition of default in the contract at issue, but instead must be given its 'plain and ordinary meaning'—namely, 'the failure to perform or fulfill some obligation or duty imposed by law or contract.'" Id. at 16–17 (quoting Metromedia Fiber Network, Inc., 335 B.R. 41, 48–50 (Bankr. S.D.N.Y. 2005), aff'd sub nom. Abovenet, Inc. v. SBC Telecom, Inc., 06 Civ. 8269 (CLB), 2007 WL 636602 (S.D.N.Y. Feb. 26, 2007)); see also In re Hawkeye Ent., LLC, 49 F.4th 1232 (9th Cir. 2022). The Court further noted that any other interpretation would "deprive the counterparty of any remedy for potentially substantial breaches, while giving the debtor a windfall." Order at 18.

C.  Request for Leave to Appeal

On December 28, 2022, Debtors filed the instant motion for leave from this Court to appeal the interlocutory Order of December 13 pursuant to 28 U.S.C. § 158(a)(3). Debtors present the following question:

> Whether 11 U.S.C. § 365(b)(1)(A) requires a debtor to cure a theoretical future default that did not yet exist under the plain terms of the lease when the landlord filed its cure objection.

Dkt. 3 ("Motion") at 5.  400 Walnut Avenue, LLC—the PDC Landlord—and Village both filed briefs in opposition to the request (Dkt. 5, 11), and Debtors filed a reply (Dkt. 13) ("Reply").

II.  LEGAL STANDARD FOR LEAVE TO FILE AN INTERLOCUTORY APPEAL FROM AN ORDER OF THE BANKRUPTCY COURT

District courts have "discretionary appellate jurisdiction over an interlocutory order of a bankruptcy court." In re Kassover, 343 F.3d 91, 94 (2d Cir. 2003); 28 U.S.C. § 158(a)(3) ("The district courts of the United States shall have jurisdiction to hear appeals . . . with leave of the court, from other interlocutory orders and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges . . . ."). "In exercising their discretion as to whether to grant leave to appeal an interlocutory order in a bankruptcy case, district courts have generally applied the standards set forth in 28 U.S.C. § 1292(b)," which govern certification of interlocutory appeals from the district courts to the courts of appeals. In re Hawker Beechcraft, Inc., 13 Misc. 373 (PKC), 2013 WL 6673607, at *4 (Castel, J.); see also Escondido Mission Vill. L.P. v. Best Prod. Co., 137 B.R. 114, 116 (S.D.N.Y. 1992).

Applying the section 1292(b) standards, "leave to appeal an interlocutory order will be granted only if the order (1) involves a controlling question of law (2) over which there is a substantial ground for difference of opinion and (3) if an immediate appeal would materially

advance the ultimate termination of the litigation." Escondido Mission Vill. L.P., 137 B.R. at 116; 28 U.S.C. § 1292(b). "[A]ll three requirements set forth in section 1292(b) must be met for a Court to grant leave to appeal." In re Futter Lumber Corp., 473 B.R. 20, 26–27 (E.D.N.Y. 2012). Additionally, even where these three criteria are met, "[l]eave to appeal an interlocutory order should be granted 'only in exceptional circumstances that overcome the general aversion to piecemeal litigation and justify departing from the basic policy of postponing appellate review until after the entry of a final judgment.'" Platinum Partners Value Arbitrage Fund L.P., 22 Civ. 6376 (GHW), 2022 WL 4357548, at *3 (S.D.N.Y. Sept. 19, 2022) (quoting Picard v. Est. of Madoff, 464 B.R. 578, 582 (S.D.N.Y. 2011).

III. DISCUSSION

Debtors request leave to appeal the December 13, 2022 Order of the Bankruptcy Court. Debtors concede that this was an interlocutory, rather than a final, Order. The Court will deny the request. The three section 1292(b) factors governing such a request will be addressed in turn.

A. Controlling Question of Law

"A controlling question of law is one in which either (1) reversal of the bankruptcy court's order would terminate the action, or (2) determination of the issue on appeal would materially affect the outcome of the litigation." In re China Med. Techs., Inc., 2013 WL 6667789, at *10 (S.D.N.Y. Dec. 17, 2013) (internal quotation marks omitted). The question presented "must be a pure question of law that can be decided quickly and cleanly without detailed study of the record." Id.

Debtors assert that there is a single, clear issue of law to be reviewed: whether section 365(b)(1)(a) of the Bankruptcy Code "requires a debtor to cure a future default that did

not yet exist under the plain terms of the lease when the landlord filed its cure objection." (Motion at 2)

At the outset, the Court notes that, as framed, the question presented does not reflect a determination of the Bankruptcy Court. The Order did not compel Debtors to cure a future default under the terms of the lease, and it did not require anything as of the filing of the cure objection. Instead, the Court determined that at the time of <u>the transaction</u> Debtors were already in default as to allegedly unmet repair obligations—even under the plain terms of the lease—and Debtors were required to cure these present defaults. (Order at 16) Additionally, the Court ruled that the lease provisions did not even control: The word "default" in section 365 of the Bankruptcy Code was used in its ordinary sense and operated irrespective of the use of the word in the lease. (<u>Id.</u>)

Nevertheless, the question posed has been carefully constructed to present a controlling issue of law. Debtors argue that (1) the term "default" as used in section 365 incorporates the meaning of that term as used in the relevant lease, <u>and</u> (2) the sole time to assess default under the lease was at the filing of the cure objection,[3] not when the lease was assumed and assigned. If this Court were to agree with both premises, the alternate holdings of the Bankruptcy Court would each be precluded. While reversal of the Order would not bring a swift end to all litigation in this matter, it would certainly materially affect the outcome for Debtors, who would escape all liability for the repairs outlined in the cure objection.

As discussed below, however, Debtors cannot satisfy the remaining factors.

---

[3] Or, perhaps, Debtors ask us to assess default from when Debtors filed their cure notice. <u>See</u> Motion at 10 n.3 ("Landlord never took the steps necessary to establish a breach or default under the Lease before Fairway filed its Cure Notice.")

B.  Substantial Ground for Difference of Opinion

"A substantial ground for a difference of opinion exists where there is genuine doubt as to the correct applicable legal standard relied on in the order." In re China Med. Techs., Inc., 2013 WL 6667789, at *11 (citing In re Adelphia Commc'ns Corp., 333 B.R. 649, 658 (S.D.N.Y. 2005)). "Genuine doubt exists where '(1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression.'" In re China Med. Techs., Inc., 2013 WL 6667789, at *11 (quoting In re Enron Corp., et al., 01-16034, 2006 WL 2548592, at *4 (S.D.N.Y. Sept. 5, 2006)).

To prevail on appeal, Debtors would need to establish two points of law. First, they must show that "default" as used in section 365(b)(1) should be defined by the terms of the relevant lease. Debtors have pointed to authorities they contend show that this is a debatable point of statutory interpretation. See, e.g., In re Metromedia Fiber Network, Inc., 335 B.R. at 49 (noting as an aside that a related argument "would carry weight" if applied to the portion of section 365(b) at issue in this appeal); but see id. ("But the word 'default' as used in the statute and in common parlance is defined simply as 'the omission or failure to perform a legal or contractual duty[]' . . . [and] cannot be changed . . . by heterodox provisions in private contracts.") But as discussed above, the question of how to define "default" alone does not control this case. The Bankruptcy Court found that the even under the terms of the lease, Debtors were in default as to any existing repair obligations at the time of the transaction. This is not a finding the Court has cause to revisit, nor would it delve into the record to do so at this juncture.

For this Court to reverse, then, Debtors must also establish that under section 365 the relevant time to evaluate lease default was the moment the Landlord filed its cure objection,

not the time of the transaction. Debtors have not established that there is genuine doubt about this matter.

If treated as a matter of "first impression," the question is not "particularly difficult." In re China Med. Techs., Inc., 2013 WL 6667789, at *11. Section 365(b)(1) is unambiguous that cure is required for defaults in existence at the time of assumption, which here occurred at the same time as the sale by assignment:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee . . . cures . . . compensates, or . . . provides adequate assurance of future performance . . . .

11 U.S.C. § 365(b)(1) (emphasis added). The statute does not provide for the expiration of rights as of the filing of a cure objection.

Nor have Debtors shown that there is conflicting authority regarding tethering default to the moment of the cure objection. They argue that "[a] cure objection must raise 'present defaults' that already exist, not provide notice of 'defaults that are not yet in existence.'" Reply at 3 (quoting In re R.H. Macy & Co., 236 B.R. 583, 591 (Bankr. S.D.N.Y. 1999), aff'd, 283 B.R. 140 (S.D.N.Y. 2002)); see also Motion at 6 n.2. Based on this proposition, they reason that the cure objection cannot serve as notice for a default that will—but has yet to—accrue before assumption. (Reply at 3) But the proposition is wrong: The passage cited and selectively quoted contains no reference to a cure objection, but simply states that "[b]y its terms, section 365(b)(1) requires that the trustee cure present defaults, not defaults that are not yet in existence." In re R.H. Macy & Co., Inc., 236 B.R. at 591. The R.H. Macy court explained that it was discussing "future obligations," which meant "debts not yet payable pursuant to the terms of the applicable contract as of the date of assumption." Id. (emphasis added). As the Bankruptcy

Court in this dispute likewise assessed default under the lease as of the date of assumption, there is no conflict here.

The Court concludes that there is not substantial ground for difference of opinion on the question presented. The request for leave to appeal can be denied on this ground alone.

C.  Materially Advance the Ultimate Termination of the Litigation

As Debtors have not met their burden on the prior factor, "the Court need not consider the third factor, whether the interlocutory appeal would advance the ultimate termination of the litigation." In re China Med. Techs., Inc., 2013 WL 6667789, at *12. But the Court notes that even if this appeal were resolved in Debtor's favor, litigation over the allegedly defaulted repair obligations would likely continue. Debtors admit as much:

> But the fact that the Landlord missed its opportunity to assert its rights against Fairway does not prevent the Landlord from demanding that its current tenant, Village, perform ongoing maintenance and repair obligations or from subsequently declaring a default if Village fails to perform its ongoing obligations in accordance with the Lease after the requisite notice. In fact, the Lease contains a "no waiver" provision that preserves the Landlord's rights to do just that. See Lease § 23.

Motion at 10, n.3. A ruling exculpating Debtors seems to simply invite further litigation between Village and the Landlord.

D.  Exceptional Circumstances

Finally, even if Debtors had met their burden on all three of the above factors, they have not shown that this appeal displays exceptional circumstances justifying interlocutory intervention.

Debtors argue that the requirement of exceptional circumstance is satisfied when the third section 1292(b) factor—whether an appeal will materially advance the ultimate

termination of litigation—has been met. For this proposition, Debtors cite to Fairfield Sentry Ltd. v. HSBC Sec. Servs. (Luxembourg) S.A., 21 Civ. 10316 (LAP), 2022 WL 3910679 (S.D.N.Y. Aug. 31, 2022), but Fairfield says nothing of the sort. There, the court analyzed each of the section 1292(b) factors and then determined that the appeal presented "exceptional circumstances" because the court had previously remanded the case "for considerations on international comity." Id. at *7.

IV. CONCLUSION

The motion for leave to appeal (Dkt. 3) is DENIED. The Clerk is directed to close the case.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
February 24, 2023